And after council leave the table. Thank you. Case number 141814, Robert Hurt and Equal Employment Opportunity Commission v. International Services, Incorporated. Arguments not to exceed 10 minutes for 10 minutes for the defendant, Mr. Rommel for the appellant. May it please your honors, I represent Robert Hurt. This court has repeatedly emphasized. Let me just ask you, you've got 10 minutes. Do you want to reserve any of that for rebuttal? Thank you, Judge Clay. Five minutes, please. All right. You may proceed. Thank you. Concerning the summary judgment standard, this court has repeatedly emphasized that all facts and inferences would be taken in the favor of the non-moving party, and that if there are facts sufficient to present to the jury, that should be done. And the summary judgment should be so granted only if so one sided that it's entitled, defendant is entitled to judgment as a matter of law. And that standard has been emphasized by your honors in various opinions, especially in the employment context. And here there is abundant evidence on the record to submit these issues to the jury on the elements of disability discrimination and retaliation, FMLA interference and retaliation. And the first thing I'd like to address is the concept of constructive discharge, because the court below found that there was no constructive discharge, and in fact found that there was no adverse employment action. This is a continuum. Something relatively minor might be an adverse employment action, but not rise to the level of constructive discharge. The court's... One of the more recent statements about that distinction was in the Laster versus City of Kalamazoo case, where some criticism and omission from meetings was enough for an adverse employment action. Now, to constitute a constructive discharge, it should be objectively intolerable to a reasonable person with the intent to drive the person out. And I'd like to emphasize those facts that support a finding of constructive discharge. Very important in this record is that this was Mr. Hurt's second time working for ISI. Again, he's an analyst. The job he has is 100% travel. He has to go to a place that's been identified by a salesperson that says, I might be interested in a survey. Mr. Hurt goes and spends typically two days and explains what a survey is. And if he sells a survey, that's very lucrative for the company. It could be about $40,000. So he does... Typically, it takes about a day and a half, two days to spend time with the employer for that. So he's traveling all the time. They knew that when he left the first time, he left because of negative cash flow. That's in the record. That's his letter of resignation in July of 2010. They wooed him back. They enticed him or recruited him to return. And he specifically says, I will return if I have a different compensation package. He said, I need a salary and 12% commission on top of that, prepaid hotel and a per diem. I wanna talk briefly about this concept because it can get a little confusing. In the record, a salary, as we understand a salary, you get money and it's your money. The witnesses, such as Tyler Burgess in his deposition, he agreed that salary is the same as a guarantee or a forgivable draw. So all three of those concepts are the same thing. Salary, a guaranteed amount of money or a forgivable draw. Those are to be distinguished from what ISI is saying is a draw against future commissions. In other words, you might have to pay it back if you don't earn enough. So there's a factual dispute about whether, in fact, he had negotiated a forgivable draw or guarantee. So before we even get to the concept of, did they constructively discharge by taking away his salary, we first have to establish that he did, in fact, have a salary. So he testified, I specifically negotiated a salary, a forgivable draw, a guarantee. The memo, the employment memo that's in the record doesn't say one way or the other, it says draw. It doesn't specify whether it's forgivable or not. But in the text messages... In those instances, is there a presumption that we would otherwise apply? I don't believe so, Your Honor. In this type of business, ISI did. It was unusual for them to give a salary to their analysts. Most of them worked on straight commission,  and in fact, the pay records themselves support that. We attach the pay records to this, and it shows that every single week, or every two weeks he got paid, he got the exact same amount, the $2,600. In fact, there was one time when he got a little bit more than that, and it supported his contention that not only did he have that base salary, but he could earn commission on top of that salary. In addition, at no time is there any evidence that they ever gave him a salary. Hey, you're behind in your commissions, and we wanna give you notice of that. So when he talked in his text messages with Donna Brewer on 331, that text message exchange, they talk about a salary. In fact, Donna Brewer uses the term guarantee. She says, Tyler is gonna pull your guarantee. And this was shortly after the official doctor's note was presented. Why would Donna Brewer use that term guarantee if there's not a factual dispute that he did, in fact, have a guaranteed salary? So that, in at least her statement, she says enough facts to indicate a factual dispute as to that. In the September 5th phone call that Mr. Hurt recorded, and we provided a transcript of that, the same thing. He repeatedly says, you're pulling my guarantee, you're pulling my guarantee. She never denies that there was a guarantee, she simply says, we have to move forward. And the next day, she emailed him and asked for a copy of his compensation arrangement because he said, you're violating my compensation arrangement. They may say that this was a renewable, or excuse me, a reviewable compensation arrangement. And in fact, the document does say it's reviewable. But there's a couple of important points about that. There was never a review process. The first, they simply took it away. I'm afraid you're out of time there. Yeah, that five minutes goes fast. I will... Unless you want to use some of your rebuttal time. If I could take... Let me take one minute of my review, one or two minutes, and whatever's left over, I'll rebut, if I may. How much? One minute or two? Two minutes. Alright. And then I'll use three for rebuttal. Okay. They're going to say it was reviewable. Tyler Burgess, in his deposition, said, here's what I meant by reviewable. Because remember, Tyler Burgess is Donna Brewer's boss, Donna Brewer is to whom Mr. Hurt reported. He said, review meant it could review only upward. He said that at page 3738 of his deposition. And I asked him, what happens if he's not making his sales? Then he says, he's fired. At no time did Tyler Burgess ever say, review means I'm going to take away your salary. So having established sufficient facts for the jury to conclude it was a guarantee, the next part of the analysis is, what did they do to constructively discharge him? Well, you look at the Ciroli case, they took away his salary, $70,000 is just gone. They took away his prepaid expenses, hotel, rental car, mileage, meals. He had to submit reimbursement and he has to pay for this with no salary. So he has no money coming in and he has to pay for all of these 100% travel expenses. The flights were prepaid, that continued. This, and they put him in the hole to the tune of $22,000 and suddenly, without warning, so even to the extent he is earning a commission, he's going to have to repay them. He's not going to see the first $22,000 of his commission until that's repaid. And the intent factor is shown by them belittling him when he asked for accommodation requests, denying the accommodations, saying, you got to go get your man billing, tell him to get your D out and they knew very well that he negotiated a salary to return. They knew very well that he couldn't afford it if he didn't have a salary. He said, without the guarantee, I am done. He said that quote in his text message exchange. He said to Donna Brewer in his email on 9 5, I can't afford this. I'll return to work under the same compensation arrangements as before, but otherwise, I can't afford to work. I'm gonna stop here, Your Honors, and reserve for rebuttal. Thank you. Thank you. May it please the court. My name is Anne Noel Acalino for the EEOC as amicus. We addressed a number of issues in this case, but if I may, I'd like to focus on the constructive discharge, unless you have other questions. I think that's really the heart of the case. I think it's really undisputed on appeal that the district court made a legal error in saying that a constructive discharge is not an adverse action. I don't understand ISI to argue otherwise. So, of course, the real question on appeal is whether Mr. Hurt presented sufficient evidence of constructive discharge to get to a jury. And in the commission's view, he did, both on his discrimination and retaliation claim. And we presented two different avenues by which a jury could find constructive discharge. One was by the repeated denial of his request for reasonable accommodation. That's a less typical way to establish constructive discharge, but this court has recognized it in Smith and reached a jury on his constructive discharge claim as what counsel was talking about, and that concerns the pay cut that he experienced in September 2012. And this court has said that factors that go into whether constructive discharge occurred include a reduction in salary and whether continued employment was on less favorable terms than beforehand. And we think that those facts are here. On September 1st of 2012, Mr. Hurt submitted to the company his letter from Dr. Sarnowski, and that letter stated that he was suffering from major depressive disorder recurrent and from acute anxiety. It said that he needed one day off for leave on September 4th, 2012, because of his anxiety and depression, and that she had advised him to ask about FMLA leave because he might need more time off in the next 9 to 12 months. So I think there's no question on this record that at least a jury could find that the company had notice of his disability and his request for accommodation in the form of that September 1st letter from Dr. Sarnowski. Now, ISI has argued on appeal, I think quite strenuously, that Mr. Hurt resigned before his draw was revoked. But respectfully, Your Honor, the record supports a contrary conclusion. There's quite a bit of evidence from which a jury could find that he resigned first, and that the draw was revoked before he resigned. There's the conversation, the transcript of the phone conversation between Mr. Hurt and Dr. Sarnowski on September 5th, where she says, this isn't working anymore covering your draw, and he asks, what do you mean? And she says, that means there's no more draw, and that's in the record at page ID 1145. She also tells him that he owes the company $22,000, and that he's on a $200 per day diem instead of prepaying his travel expenses. At the end of that call, Mr. Hurt says, I need to make a few phone calls and decide what to do. That also conveys to the fact finder that he was still trying to work. Brewer told him that she was taking back the coverable draw. And then later that evening, he emails with Ms. Brewer and says that he would find it difficult to continue to work with the pay and travel arrangements that she had put out, and he'd like to go back to what they had before. Mr. Hurt also testified in his deposition that the reason why he didn't resume work on September 5th was because the draw was revoked. So his deposition, he says, I was prepared to work. I was waiting for an assignment from Ms. Brewer, but she told me that the draw was revoked. Then there's other evidence too. Donna Brewer testifies that after September 5th, she was asking, when are you coming back to work? Mr. Hurt testified, yes, the company asked me when was I coming back. There's evidence that they were still processing his FMLA paperwork, and that the HR manager testified the date of resignation was September 18th. So we think a jury could find that the resignation followed the revocation of the draw. Turning to the issue of disability, the district court seemed to assume without deciding that Mr. Hurt was disabled, ISI has argued otherwise on appeal. We think that a jury could certainly find that he was disabled by his major depression, that that substantially limited his major life activities of brain function, which it's true that he did not allege specifically, but we think that that's associated with what he did allege, thinking and concentrating. He also alleged that he was substantially limited in sleeping and working. And in our view, this record is particularly replete with evidence that he was really struggling with his depression. He saw Dr. Chung, a psychiatrist, Dr. Shinava. There's a lot of notes from Dr. Czarnowski detailing his depression, his fatigue, his trouble sleeping, his loss in concentration. When he saw Dr. Chung on March 19th after his suicide attempt, Dr. Chung noted that he was having impaired cognition and I have about 20 seconds, but I think the record is also clear, even if you wanna go back earlier to the failure to accommodate that the company had noticed about his suicide attempt. The text message exchange from March 31st shows that. And although we didn't cite to it in our brief, if you look at Tyler Bridges' deposition, I believe at page 78, he says that Donna Brewer told him about the suicide attempt and that she was quite distraught. So we think there was enough evidence for that claim as well. Thank you. Thank you. Good morning. Good morning. May it please the court, Will Tishkoff on behalf of the Appellee International Services Incorporated. Your honors, I think the briefs are fairly well set forth and I don't believe that there's been oral statement today that materially raises new major issues. I'll just try to briefly summarize and use my time wisely and appreciate your consideration today. Really not a complicated case, we don't think, and we believe Judge Hood clearly came to the right conclusion. Also, with this whole notion of constructive discharge not constituting an adverse employment action. There was a statement in her opinion about that, but her actual ruling that was material was that he had not shown a constructive discharge and he had not shown an adverse employment action. And she does cite Reagan, which we cite. And that is the issue, de novo, before this court. Was there, in fact, an adverse action? Was there what they claim? And both opposing counsel talk about the constructive discharge. Let me just try to talk about those facts, and I think that's where this whole case comes down to. This gentleman was a traveling salesman, just a classic job, and he did that job for several years, 2007 to 2010, and did not like to travel. And in deposition, he talked about that. Not only, and this is kind of significant in an ADA, PWC, DRA case, everyone agrees, travel was the most essential element of the job. And he... Well, actually, he didn't just say he didn't like to travel. He said that the travel schedule, such as was required by this particular employer, had adverse consequences for his health, was, as I understood, what he was trying to get across there. Well, he came back and he joined the same job, which was a traveling salesman job. Didn't ISI recruit him back? Well, they both did He was interested in coming back. He was let go, as our understanding, by the employer he went to. He came back to the exact same job, which, as we're talking about, entailed mostly travel. And you can argue that he was a mediocre performer. In fact, he testified he was able to do his job. He just wanted some relief from the travel. But this is a travel job, and there's no evidence whatsoever that there was. Was he asking not to travel, or was he asking for a more reasonable travel schedule? I'm not sure everything is quite as black and white as you're presenting here. Well, Your Honor, there was no communication that there was a specific accommodation to be requested. He said, I'd like more sleep, and that did not translate into any particular reasonable change that could be made. In deposition, he makes a statement that I requested eight hours, but that's not in the two notes that were sent in to the employer, and there was no indication that there was some way to provide eight hours. There was no indication to the employer that there was some reasonable accommodation of the travel that was because of a disability. He did two things here that he relies upon. Well, it's even a healthy person might have problems with the travel schedule that he claimed to have been subjected to, and sometimes getting two and three hours of sleep between travel assignments and that kind of thing. Sure, and let me just make sure we understand the job. The SBAs fight tooth and nail to get the assignments. They want the assignments, that's how they make money, and that's what he wanted was the assignments other than giving him the assignments. If we had not given him assignment, then he would have said that he was retaliated against by not giving him the work. And terminating his draw was not a consequence of what he asked for? It was not, and I just... Focusing on the exact sequence of events, it was ISI's understanding he had a family event the day after Labor Day, but be that as it may, he went to a relatively new psychiatrist, and she wrote a letter on September 1, which very, very plainly said that she saw him as suffering from stress, and he was not able to work. Heard as suffering from acute anxiety and depression, and is not able to perform daily work activities due to acute symptomology, period. Robert may return to work on Wednesday, September 5, 2012 at 8 AM without restriction, unquote. That is the letter wrote to whom it may concern on September 1. It's faxed the next day to a closed office because it's Labor Day. Mr. Heard testified in deposition, he did not seek or receive any treatment on that day after Labor Day, the 4th. And he said he did not recall difficulty going about his day. Now, there is no qualification for FMLA under those circumstances, but setting it aside, we received the letter on the 4th, ISI did, and he was granted his leave, and the record is clear, everyone agrees. I asked him in deposition, did anybody interfere with your leave? And he said, no, they allowed me to take it. Did you come back the next day on the 5th? Page 114, I did not resume. He had already, he had quit his job and ceased performing activities at 8 AM on the 5th, with no denial of the leave, with no denial of any accommodation. The Charnowski letter, September... When you say ISI, what was the date on which ISI terminated his draw? Your Honor, there wasn't a termination of the draw until after he ceased working. And what is cited by the plaintiff is a secretly taped phone call much later in the day, because he knew he was gonna get into an argument with his supervisor, in which he said that that would be the intent of ISI to not have a forgivable draw, because he had already over his commission, he owed $22,000. There's nothing in the record that shows that it was actually processed on the 5th. There was no back dating or anything that happened on that date. Almost every day after the 1st... After the 5th, he stopped on the 5th, he was asked, when are you coming back? I've done FMLA statutes for years, I've been on the other side of the coin, and certainly you're entitled when you actually take a leave to return to the job, but there's no such thing as taking your leave, not coming back to the job that's there. Assignments were ready to be given, and there was not a single communication from him that he was coming back. Mr. Rimmel represented him by sending a letter on September 18, which is part of the record, which is when he says, my client is not returning, I'm concerned about how you handled his leave on the 4th, and I'd like to negotiate a severance package. He never came back and did any work. So clearly, he could have performed work activities on the 5th, he testified he did not resume, he did a secret tape recording, but he never came back whatsoever. The only communications of what he was looking for are a March 5 email, where he sent it to Ms. Brewer and says, this is what I'm working through, I will be able to get through this. There is no request in there for eight hours, there's no request to modify the schedule whatsoever. And I interviewed the post, Dr. Little. She said, this was a patient plan, it was not intended to be a prescription for an accommodation, it was just a visit he went to her. He had multiple symptoms. Let me see if I've got this straight. He asked for a leave, now he doesn't get an immediate answer, so he hasn't gotten an answer to that request. In the meanwhile, he doesn't return to work. Now, at some point, his drawer is taken away and he's charged this $1,200 for expenses. Those things happened after he made his leave request during the time he had not returned to work. Was that the sequence of events? I do not think it was, just a couple of material items. The leave request was a fax, I just went over here, dated September 1, from Dr. Chanelski, where she asked for a one day leave, which was on the 4th, and she would release them to come back on the 5th. I'm not talking about what the doctor did right now. He requested a leave. That's how he requested it, he just got a fax and sent it. It's very important, what is an employer to do here? He didn't call them and say, I wanna leave to begin for even an indefinite period. There was paperwork sent in later from Dr. Chanelski after he had stopped working, but the original request for leave was for one day, and that was on the 4th, and it said he was released to return back on the 5th. Didn't ISI process Hurt's FMLA leave request through September 11th? There was paperwork that was sent in later, and the paperwork was received in process, but it wasn't for any days off. There was a request that indicated he might need to ask for intermittent leave. Remember, he's already ceased working, he's not performing activities and hasn't returned. And under the FMLA, you can tell your employer when you need intermittent leave if you actually have given them notice. He didn't ask for intermittent leave. He didn't say, I can't go on assignment. I understand that. I just wanna make sure that I'm clear on your answer, though. Absolutely. Okay, so it was processed through the 11th. Well, there was... I think... I believe it was on the 11th. They asked him, are we gonna get the paperwork from Chanelski? He never asked for any leave. There was more paperwork that Dr. Chanelski filled out saying, intermittent leave, which I think was... And I'll check the record, was sent back on the 11th. That's where I get the date. But the record's clear. He did not ask to use the intermittent leave. He never returned. Absolutely clear. Yeah. So, was he technically on ISI's payroll then through the 11th? He never performed any work after the 4th, but I would agree that they would have to have processed the payroll later, and so there would be processing. So, from the 4th, at least through the 11th, it was within ISI's contemplation that Hurt was still their employee, still its employee, rather. I do think that's very important. They knew he hadn't come back to work, and they were asking him, and the office was emailing him and calling me, are you coming back? Because what they do is they send him on the assignment, and he didn't come back. I've just never heard of an employer where the person has completed a leave, and there's a job ready for equivalent pay, etc. They don't come back, and you say, are you coming back? Are you coming back? Do you want intermittent leave? What do you want? And their attorney comes in several weeks later and says, I'm not coming back. He was asked in deposition, when did you cease work? And he said, I did not resume work on the 5th. That's what I asked him. And Judge Hood agreed with that. I don't think she was wrong. What would you do for an employee that doesn't want to travel for a traveling sales job? If you saw our letter from even April of 2012, he told his medical provider, I'm looking for another job. This is not working for me. It's not that he couldn't do the job, and he says that. I can travel. He says, I'm very stressed out when I'm traveling. I can do the job. What would be a reasonable accommodation for a sales job that's, as the other slide says, is close to 100% travel. Not 100%, but close to. Let me ask you one thing. Just to be clear about what your position is, is your position that the actions of the employer could not amount to a constructive discharge, taking away his draw and taking away his 22,000, charging him the 22,000 and all that, that those things could not constitute or did not constitute a constructive discharge? Is that your position, or is your position something else? Is it that he had quit or abandoned his employment prior to the employer taking these actions, these adverse actions, and so there's no... Even though these acts could have amounted to a constructive discharge, they didn't constitute a constructive discharge because he had already left his employment. Is that your position, or what really... Could you clarify what your position is on all this? Absolutely both. He had testified he had... Well, it can't be both, can it? He can't both be constructively discharged and also having quit the job prior to being constructively discharged. That's why I'm asking you, which is it? No, he had stopped performing activities. The fact that the employer didn't know doesn't change. The case law says activities by an employer after they've quit or stopped work are not relevant. So he was still employed, in your view, when the employer took away his draw and sent him this bill for $22,000, is that right? He had ceased performing activities on... Well, I know that, but when the... Nevertheless, when the employer took these actions, he was still an employee. Not for anything as to when he rendered work. None of that... Well, I know he wasn't coming to work, but at that point, when the employer took these actions, at that point, the employer still considered him to be an employee at that point, correct? Is that correct? If he actually... If he returned to work, if he returned to work, that's what it would be and that's what the record reflects. But it was nothing other than enforcing the exact terms of the memo, which said that not that there was a forgivable draw, but a draw that could be reviewed, and they took no action to adjust anything for anything... Alright, I can draw. I'm still wondering the same thing, but the problem, Mr. Tishkoff, is that our questions are an opportunity to persuade and if you don't ask for them, well, dot, dot, dot. We certainly believe that that is what exactly happened here, is that there was a confirmation of what Donna Brewer had said for months, we can't continue to have a draw that is gonna be where you're not gonna have to pay for it. And so, as of going forward in September, we are simply gonna honor what I told you would be the case. He hadn't worked, it didn't affect what he was doing, but she did say that. Now, we just simply say the enforcement of the terms of that exact memo, which says nothing about a guaranteed draw, was nothing other than exactly their legal rights. I don't see how that could become... On a timeline, let me just ask Judge Clay's question different because I have the same question. On a timeline, his draw was revoked and he was in... He became indebted to ISI at a time prior to September 11th. Is that right? He was already indebted prior to September 5th and also September 11th, nothing changed. He was already built up a 22,000 indebtedness. That is already the case. Yeah. So, I'm gonna take that as a yes. Right, right. He was already indebted and no more debt increased whatsoever. And Donna Brewer had already told him, we are gonna have to not offer you a draw if this continues. What day did she tell him that? She had told him that in the record several months earlier, several months. She had been saying that we're not gonna be able to continue the draw. He secretly recorded her because he wanted to establish evidence of some retaliation, got into a fight with her and she said, well, yes, we're not gonna continue the draw. But he hadn't performed any work and there was no impact on his debt or otherwise. This clearly was an employee who wanted to stop working and not do the travel position. And he secretly recorded his employer and tried to create an issue here. But absolutely, when he had ceased work, there is no violation of the ADA or the FMLA, possibly in this case. He chose voluntarily, after enjoying the leave, not to come back. There is no actual reasonable accommodation that could be granted. Appreciate it very much. Thank you. Thank you. Appreciate it. Any rebuttal? Thank you, Your Honors. I think that shows that there is, in fact, a factual dispute. What I'd like to do is just run through that sequence. So September 1st was a Saturday. He saw Dr. Sharnowsky that day. He'd been seeing Dr. Sharnowsky for several months. She faxed the note requesting not only an FMLA leave day for Tuesday after Labor Day, which was the 4th, but also said he will want intermittent leave. He may require that beyond that. On the 4th, that Tuesday, he's off. He speaks to Donna Brewer on the 5th. Donna Brewer says to him, there's no more draw. And she says, it's backdated to September 1st, which is significant, because that's the day of Dr. Sharnowsky's fax. There's an email exchange between Mr. Hurt and Donna Brewer on the 6th, on the 5th and the 6th. Later that evening, it's in the record, the email exchange, Mr. Hurt says, I would like to come back and continue working under the same arrangements I had before I made my FMLA request. He says, I would like to come back and continue working under that same arrangements. She says, let me see your compensation memo again, because there's this whole thing where... I didn't even have a copy of that. So he faxes it to her, and then he says to her on the 6th, by the way, I still don't have the FMLA paperwork for Dr. Sharnowsky to fill out. They get that to him. She fills it out. She faxes it back, actually, on September 10th. On September 11th, Marie Demko, who's the HR person, faxes back, got all your paperwork, it's all in order. Great, when can you start working again? Donna Brewer says, in that same time frame, between the 5th and the 11th, I had numerous conversations about him returning to work. Hurt's position was consistent, I'll come back if you pay me. It was the 18th of September, Judge Marbley, when John Andes, the chief HR guy, said, that is the date I considered his official termination date, because that's when I faxed my letter. And he said, that is the date that I coded in the records, that that was the official last day of his work. I do wanna say one last thing about, I think I have a minute, the Regan case, which was relied upon by the lower court. If you look at that case, it consistently relies upon the employer can't control things that are outside the work environment, commuting. It's not, here's a job where it is 100% travel, so the travel is controlled by the employer. They set the travel arrangements, they can control all that. He asked for a reasonable amount of sleep. The article that Tyler Burgess published in his own magazine said, quoting a chief neurologist from the University of Northwestern, a reasonable amount of sleep is seven to eight hours, otherwise it's gonna affect an employee's performance, and it's gonna affect even a healthy person's performance. The March 5th letter clearly said from Dr. Littles, I recommend sleep hygiene. They're supposed to engage in the interactive process at that point when there's anything that's even plausible as a request for an accommodation under the SERS case. They didn't do that. They told them, get your D out and toughen up. This case should be remanded for a factual determination of the issues. Thank you, your honors. Alright, thank you, and the case is submitted.